### Will ROYSTER, Appellant,

v.

### John J. RIZZO, et al., Respondents.

### No. WD 72947.

Missouri Court of Appeals,
Western District.

Oct. 13, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 7, 2010.

Philip O. Willoughby, Jr. and Arnold R. Day, Jr., Kansas City, MO, for appellant.

Michael J. Gunter, Kansas City, MO, for respondent John J. Rizzo.

David B. Raymond, Charles G. Renner and Hannah K. Hemry, Kansas City, MO, for respondent Kansas City Board of Election Commissioners.

Edwin R. Frownfelter, Kansas City, MO, for respondent Secretary of State of Missouri.

Before Special Division: JAMES M. SMART, JR., Presiding Judge, MARK D. PFEIFFER, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

This is an election contest that arises out of the August 3, 2010 Primary Election to determine the Democratic candidate for the office of State Representative. Will Royster, a Democratic candidate for office of the State Representative for the 40th Legislative District, sued John J. Rizzo, also a Democratic candidate for the office, the Kansas City Election Board, and the Missouri Secretary of State.[1] This lawsuit

1. The original Petition also sued the Jackson County Board of Election Commissioners and the Clerk of the Jackson County Legislature,

was filed after Rizzo was certified as the winner of the contest, eventually by a vote of 664 to 663.

After a trial on the merits of Royster's claims, the trial court denied all requested relief. For all of the reasons set forth herein, we affirm.

## Factual Background

It is not disputed that the result in this election was very close. On August 16, 2010, the Kansas City Election Board ("Board") certified the results of the election to be 667 votes for Rizzo and 664 votes for Royster. Thereafter, the Missouri Secretary of State ("Secretary") announced the Official Election Returns by the Board of State Canvassers for the Primary Election, which included the tally of the votes for the instant office that was identical to the Board's vote count.

On August 24, 2010, Royster filed an election contest, and also requested the Secretary to conduct an automatic recount pursuant to Section 115.601.[2] This recount took place on September 8, 2010. The results of the election were certified, following the recount, to be 664 votes for Rizzo and 663 votes for Royster.

On August 24, 2010, Royster filed his Verified Petition to Contest Election in the Jackson County Circuit Court, and the First Amended Petition was filed on September 7, 2010. In his Amended Petition, Royster alleged a variety of voting irregularities that he claimed were in violation of Missouri state law. Specifically, Royster alleged, *inter alia*, that non-English speaking voters were improperly assisted or instructed on how to vote at two polling locations, that improper electioneering occurred at one polling location, that certain

precincts were improperly consolidated into a single polling place, and that other voting formalities required by state law were not followed during the election. Furthermore, the Petition contained the following three counts seeking relief: Count I (Request For Recount Due To Irregularities); Count II (New Election); Count III (Request For Recount Because Of Less Than One Percent Difference In Vote).

On August 30, 2010, the trial court issued its Order To Unseal Ballots and Protective Order, which permitted "the parties to review and inspect confidential information related to the Election Contest." Royster also engaged in discovery in preparation for the trial on the claims contained in his Petition.

On September 7, 2010, a bench trial was held. Upon conclusion of the evidence, the trial court announced from the bench that it was not going to order a new primary election and took the matter under advisement for preparation of a judgment.

On September 14, 2010, the trial court granted Royster's motion to reopen the evidence prior to entering a final judgment, and Royster was allowed to present additional evidence. Thereafter, the trial court issued its Judgment, denying all of Royster's claims and requested relief.

The trial court on September 15, 2010, then issued its Amended Judgment, which clarified "that this judgment is final for all purposes and ripe for immediate appeal without a thirty day waiting period." Royster now appeals.

Royster focuses most of his arguments on alleged irregularities at two polling places, namely Garfield Elementary School

but these parties were not included in the Amended Petition.

2. All statutory citations are to RSMo 2000 as updated through the 2009 Cumulative Supplement, unless otherwise indicated.

and the Kansas City Museum. Further facts pertaining to this election will be outlined as relevant in the analysis section.

## Standard of Review

Section 115.551 vests this Court with the authority to hear the instant appeal. The parties do not dispute that our applicable standard of review is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), and that, therefore, the judgment of the trial court should be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or the trial court erroneously declared or applied the law.

## Analysis

Royster raises four Points Relied On in this appeal, but the thrust of each one "is whether or not the trial court erred when it found that the irregularities that developed during the August 3, 2010, primary election were not of sufficient magnitude under Missouri law to warrant a new election under Section 115 RSMo., or even a recount under Section 115.539, RSMo."

█ The right to vote is protected by the Equal Protection Clause of the Fourteenth Amendment and " 'is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed.' " *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (quoting *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)).

█ Moreover, the Missouri Constitution establishes "with unmistakable clarity that the right to vote is fundamental to Missouri citizens." *Weinschenk v. State*, 203 S.W.3d 201, 211 (Mo. banc 2006). Indeed, "[d]ue to the more expansive and concrete protections of the right to vote under the Missouri Constitution, voting rights are an area where our state constitution provides greater protection than its federal counterpart." *Id.* at 212.

## I. Mootness

█ At the outset, we must reject the contention by the Board that the issues involved in this appeal are moot. " 'With regard to justiciability, a case is moot if a judgment rendered has no practical effect upon an existent controversy.' " *State ex rel. Chastain v. City of Kansas City*, 968 S.W.2d 232, 237 (Mo.App. W.D.1998) (quoting *Gilroy–Sims & Assocs. v. City of St. Louis*, 697 S.W.2d 567, 569 (Mo.App. E.D. 1985)). " 'The existence of an actual and vital controversy susceptible of some relief is essential to appellate jurisdiction.' " *Hall v. Mo. Bd. of Prob. & Parole*, 10 S.W.3d 540, 545 n. 3 (Mo.App. W.D.1999) (quoting *Armstrong v. Elmore*, 990 S.W.2d 62, 64 (Mo.App. W.D.1999)). "Because mootness implicates the justiciability of a case, the court may dismiss a case for mootness *sua sponte*." *Chastain*, 968 S.W.2d at 237. "We do not decide questions of law disconnected from the granting of actual relief." *Id.*

Were this Court to order a new primary election pursuant to Section 115.549 contemporaneously with this order, there would be sufficient time for this election to occur prior to the general election on November 2, 2010. "There is no doubt the legislature in the comprehensive Election Act intended primary election contests to be fully decided prior to the general election." *Black v. Bockenkamp*, 607 S.W.2d 176, 177–78 (Mo.App. E.D.1980). All that is required in ordering a new election pursuant to Section 115.549 is that the election take place not less than fourteen days or more than thirty days after ordered, and sometime prior to the general election.

Because we are within that timeframe there is also time to ensure that the new primary election is certified prior to the November 2 general election. For this reason, we believe this controversy is not moot; because were we to order a new election pursuant to Section 115.549, there can be no doubt that it would have a "practical effect upon an existent controversy." *Jackson Cnty. Bd. of Election Comm'rs ex rel. Brown v. City of Lee's Summit*, 277 S.W.3d 740, 743–44 (Mo.App. W.D.2008).

We understand the Board's arguments that ordering a new primary election would have collateral consequences pertaining to certain individuals' right to vote, for example, in an absentee fashion. But these arguments go not to the core of whether there is an issue in controversy but, rather, to how the appropriate relief would be effectuated. Thus, this has no bearing on our analysis of the mootness issue. Ultimately, because we conclude that the trial court did not err in refusing to order a new election in this matter, we need not reach these various issues regarding what rights *might* be implicated were a new election to be ordered in this matter.

## II. Recount

■ In rejecting Royster's requested relief of a second recount of the election, the trial court made the following findings of fact and conclusions of law:

Because Contestant Royster requested the Secretary conduct an automatic recount under [Section] 115.601, which was scheduled for Wednesday, September 8, 2010 at 9:00 am at the office of the Kansas City Election Board, was completed on that date, and the results have been certified by the Missouri Secretary of State, the relief requested in Count III is moot. Contestant Royster had already received a recount based upon

less than one percent difference in the vote, and he is entitled to only one (1) recount under this statute.

Royster does not challenge any of the above findings or conclusions, yet he still persists in arguing that a recount is currently a viable basis for relief and that the trial court somehow erred in denying such a recount. Royster argues that "[t]he only practical remedies are a new election or a hand recount with directions to eliminate all defective ballots."

Royster's argument is flawed because it fails to take into account the fact Missouri law provides that he is entitled to only one recount in this context. *See* Section 115.601.5 ("For purposes of this section, 'recount' means one additional counting of all votes counted for the office or on the question with respect to which the recount is requested.").

While he suggests that he is entitled to a "hand recount with directions to eliminate all defective ballots," Royster fails to cite any authority that supports the contention that the trial court erred in refusing to grant such a recount under the present circumstances. Section 115.539 states that the circuit court is allowed to order a recount of votes in the following situation:

If the court finds there is a prima facie showing of irregularities which place the result of the primary election in doubt, the court shall order a recount of all votes brought in question by the petition or its answer. Where the issue is drawn over the validity of certain votes cast, a prima facie case is made if the validity of a number of votes equal to or greater than the margin of defeat is placed in doubt. The court may order a recount of all votes brought in question by the petition or its answer at any time if it finds that the primary election result is placed in doubt. All materials and rec-

ords relating to the contested election may be subpoenaed and all information contained therein shall be subject to the rules of discovery in civil cases. During a recount, the court may hear additional evidence offered by any party bearing on any issue relating to the contested election.

But here Royster ignores the relevant findings of fact, outlined in detail below, that determined that he failed to make a "prima facie case" for a recount because he did not demonstrate that "the validity of a number of votes equal to or greater than the margin of defeat is placed in doubt." *Id.* These findings and conclusions are as follows:

> The credible evidence proves that only registered voters voted a[t] Garfield Elementary School and the Kansas City Museum voting locations. That evidence also proves that there is no question that Contestee Rizzo received 664 votes and that Contestant Royster received 663 votes. The credible evidence proves that there was no voter misconduct and there was no voter fraud with regard to this election.

The court could reasonably find that there was no misconduct by any voter. Also, we believe the court could reasonably conclude that the evidence fails to show that there was any fraud practiced as to even one vote. Royster has failed to make any showing that would demonstrate that among the votes cast, any specific vote was cast or failed to be cast by some specific wrongdoing. For example, in a case such as this with a margin of victory of only one vote, had Royster presented evidence (which the trial court found credible) that one specific non-registered voter was allowed to vote or one registered voter was denied the right to vote, we would be more persuaded that Royster had made the requisite showing pursuant to Section 115.539.

Because he has failed to make such a showing and because he has already had one recount, we affirm the trial court's denial of a recount of the votes in question.

## III. New Election

Royster brings four Points Relied On, all of which ultimately argue that the trial court erred in failing to order a new primary election. Accordingly, we must outline the overarching legal principles that apply to all of these issues that seek the same ultimate relief. Section 115.549 states the following:

> **New primary election may be ordered, when.**
>
> If any court trying a contested primary election determines there were *irregularities of sufficient magnitude* to cast doubt on the validity of the initial election, it may order a new primary election for the contested office.
>
> . . . .

*Id.* (emphasis added).

■ The Missouri Supreme Court has repeatedly made clear that a new election is a "drastic remedy." *Bd. of Election Comm'rs of St. Louis Cnty. v. Knipp*, 784 S.W.2d 797, 798 (Mo. banc 1990); *see also Kasten v. Guth*, 395 S.W.2d 433, 435 (Mo. banc 1965). A new election "is appropriate [only] where the validity of the *entire* election is under suspicion" because a "new election tosses aside the aggregate of the citizens' votes, both those properly and improperly cast." *Knipp*, 784 S.W.2d at 798; *see also Gerrard v. Bd. of Election Comm'rs*, 913 S.W.2d 88, 90 (Mo.App. E.D. 1995) ("Only when the trial court is firmly convinced irregularities affected the outcome of the election should an election be voided.").

Royster fails to acknowledge and seems to take issue with the above bedrock principles in this well-established area of law. Rather, Royster urges a novel theory on

the trial court's role in ordering a new primary election, suggesting that once any "mandatory" election statute is violated "the court's views of the importance of the requirement become immaterial, the statute must be enforced, the vote and election are void and there is no discretion to be exercised" but to order a new election. On oral argument, Royster wisely softened this argument somewhat as not necessarily applicable in cases with a wide vote margin, but his argument still essentially suggests that *any* violation of *any* election law requires a new election. This has never been the law of Missouri. Rather, the Missouri Supreme Court outlined the following principles in 1891 that still govern today:

> If the law itself declares the specified irregularity to be fatal, the courts will follow that command, irrespective of their views as to the importance of the requirement. In the absence of such declaration, the judiciary endeavor, as best they may, to discern whether the deviation from the prescribed forms of law had or had not such a vital bearing on the proceedings as probably prevented a free and full expression of the popular will. If it had, the irregularity is deemed fatal; otherwise it is not. It has been sometimes said, in this connection, that certain provisions of election laws are mandatory, and others directory. These terms may, perhaps, be convenient to distinguish one class of irregularities from the other. *But, strictly speaking, all provisions of such laws are mandatory, in the sense that they impose the duty of obedience on those who come within their terms. But it does not, therefore, follow that every slight departure therefrom should taint the whole election.* Courts justly consider the main purpose of such laws, namely, the obtaining of a fair election and an honest return, as paramount in impor-

tance to the minor requirements which prescribe the formal steps to reach that end; and, in order not to defeat the general design, are frequently led to ignore such innocent irregularities of election officers as are free of fraud, and have not interfered with a full and fair expression of the voters' choice.

*Bowers v. Smith,* 17 S.W. 761, 762–63 (Mo. 1891) (emphasis added and citations omitted).

■ It goes without saying that certain laws, such as those ensuring that only registered voters are allowed to vote, are of such a nature that any violation may be deemed "fatal," and therefore, "courts enforce it to the letter." *Kasten,* 395 S.W.2d at 435; *see also Zeiler v. Chapman,* 54 Mo. 502 (1874). Such fatal violations are rare because to hold otherwise "would permit the disfranchisement of large bodies of voters, because of an error of a single official." *Kasten,* 395 S.W.2d at 435 (quotation omitted). "The well-established rule, here applicable, is that an election irregularity is not fatal to the validity of the whole return of the precinct unless made so by the statute on the subject or unless the irregularity is such as probably prevented a free and full expression of the popular will." *Id.* (quotation omitted). "As a general rule an election will not be annulled even if certain provisions of the law regarding elections have not been strictly followed in the absence of fraud." *Armantrout v. Bohon,* 349 Mo. 667, 162 S.W.2d 867, 871 (1942).

With these principles in mind, we now turn to the specific claims raised by Royster on appeal in order to determine whether the trial court erred in refusing to grant a new election in this matter.

## A. The Assistance of Non–English Speaking Voters

In Point One, Royster alleges that the "trial court erred in its decision when it found that the presence and actions of the Somali interpreters at two polling places, their electioneering, the directions they gave to voters on how and for whom to vote while there, and their handling and voting of the ballots and signing in for voters were not sufficient irregularities to warrant a new election."

Royster makes several different arguments in this Point, but the principal argument is that certain non-English speaking voters were improperly assisted by other individuals (interpreters) in casting their votes at the two aforementioned polling places. Section 115.445.3 provides that voters who have certain limitations or disabilities may be assisted in voting by another person:

If any voter declares *under oath* to the election judges that he cannot read or write, is blind or has any other physical disability and cannot vote his ballot, he may be assisted by the election judges or by any person of his own choice other than a judge. If the voter asks for the assistance of election judges, two judges of different political parties shall go to the voting booth and cast his vote as he directs. If the voter asks for the assistance of someone other than election judges, the assistant shall go to the voting booth with the voter and cast his vote as he directs. No person, other than election judges and members of such voters' immediate families, shall assist more than one voter at one election.

*Id.* (emphasis added).

In its judgment, the trial court made the following findings of fact that Section 115.445.3 was not followed in this election as it pertained to some non-English speaking voters. Specifically, the trial court made the following findings as it pertained to the Garfield Elementary School Polling Place:

Several voters had difficulty in communicating with the election judges and had difficulty in reading and writing, and other voters may have been blind or physically disabled. One or more individuals may have helped or attempted to help people seeking to vote by acting as an interpreter or providing assistance for those individuals. The individual(s) who may have helped or attempted to help people seeking to vote were never identified by name and no other description, other than one of the men wore a blue shirt, was provided. Testimony indicated that the "interpreter" may have been a family member of certain voters.

. . . .

The Election Judges ... testified, without contradiction, that all persons who were given a ballot were registered voters who verified their identity by showing proper identification in the check in process.

. . . .

Mr. Elmer Wyatt testified that he was an election judge for the August 3, 2010, primary election, and that he worked at the Garfield Elementary School location as a supervising election judge. He did observe two Somali gentlemen come in and vote. He did see one of those Somali men assisting two groups of voters. Mr. Wyatt did observe the Somali man acting as an interpreter for some voters, *and he was able to see that each voter did check in and show proper identification to verify that they were registered voters.* Mr. Wyatt clearly observed that the Somali man who was acting as an "interpreter" did not check in for any of the voters. After some of the Somali voters had checked in and obtained their ballots, the Somali gentlemen in question did stand behind some of the indi-

viduals while they were voting, and engaged in some unknown conversation with them.

. . . .

After observing the Somali gentlemen who was assisting some Somali voters return to the premises a third time, Mr. Wyatt did bar the said Somali gentlemen from the premises for the remainder of the day of the election.

(Emphasis added.)

Moreover, the trial court made the following similar findings as it pertained to the Kansas City Museum Polling Place:

Again, the election judges at this polling place required all persons seeking to vote to present a valid form of identification and only distributed ballots to individuals who properly identified themselves as registered voters.

Testimony was presented regarding an interpreter assisting voters that were unable to read or write or otherwise communicate with the election judges. In addition, a "Rizzo" sign was brought into the polling place for a short period of time. After about 15 minutes, or so, it was removed from the premises.

In attacking the trial court's judgment, Royster does not dispute that there was substantial evidence for the trial court to reach *all* of the above, relevant factual findings. Instead, Royster highlights evidence presented at trial and assumes that the trial court was compelled to believe the substance of the testimony of every witness who testified. All of these arguments ignore that "[t]he trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *Sch. Dist. of Kansas City v. State*, 317 S.W.3d 599, 604 (Mo. banc 2010) (quotation omitted). "When determining the sufficiency of the evidence, an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial

court's decree and disregard all contrary evidence." *Id.* (quotation omitted).

The relevant question on appeal is if the facts found by the trial court rise to the level that required the court to order a new primary election as a matter of law. In ruling that the above circumstances did not require a new primary election, the trial court made the following legal conclusions:

Contestant Royster alleged that interpreters improperly assisted several Somali voters by handling the ballots, completing ballots, and providing instructions to the voters, at the Garfield Elementary School and the Kansas City Museum polling locations. Under the plain language of the statute, if Somali voters were unable to read or write, blind, or physically disabled, they were legally permitted to request assistance in voting. The only potential violations revealed in the evidence were that voters who needed assistance may not have been asked to make a declaration under oath, or that the interpreter helped more than one person to whom he/she was not related. There was testimony that at least one of the Somali men who was assisting persons was related to those persons. It would be proper for such assistance to be provided under the law. The evidence indicates that the election judges did not request an oath in these situations, and it was therefore a mistake of the election officials that no cards with proper oaths were obtained. There is no evidence that the failure of the election officials to obtain the cards interfered with the ability of the voters to cast the vote of their choice. Because [Section 115.445.3] does not automatically result in the invalidation of such a vote, the affect of these violations must be assessed. The key issue is whether the

interpreter cast fraudulent ballots for voters or whether he voted as directed by qualified voters.

. . . .

Based on the totality of the evidence, including the Court's determination of the credibility and bias of the witnesses, the evidence demonstrated that, although one or more individuals may have engaged in suspicious conduct at the Ward 11, Precincts 3 and 4 polling place in the East hall of the Garfield Elementary School, and the election judges may have made mistakes in administering certain election requirements, such as not offering or administering an oath to persons requiring assistance ... the evidence does not establish that the conduct was fraudulent, **that any person who was not registered to vote voted,** or that any registered voter was prevented from casting their ballot as they intended.[3]

(Emphasis added.) [4]

Simply put, we believe that Royster has failed to demonstrate that the findings of fact and legal conclusions of the trial court are erroneous, and therefore he is not entitled to a new election as a matter of law. While he suggests that "[n]o less than eight (8) statutes, most of which are mandatory, come into play in this contest," he has failed to make the requisite showing that the violation of any of these statutes requires a new election. In fact, we believe that based on the trial court's factual findings, to which we must defer, only two pertinent statutes were shown by Royster to have been violated in this election pursuant to the arguments made in this Point.[5]

As discussed already at length, the trial court found that certain non-English speaking voters failed to take the requisite oath pursuant to Section 115.445.3 prior to receiving assistance in casting their vote. Critically, however, Royster has failed to demonstrate that the trial court erred in concluding that all of these voters were registered and voted for whom the individual chose without any illegal or fraudulent interference.

■■■ Royster makes several different legal arguments in an attempt to illustrate

3. While the burden placed upon the party contesting the election to "firmly convince" the trial court that "irregularities affected the outcome of the election" is a heavy burden, it is so because of the "drastic remedy" that is sought in election cases. And, while the evidentiary burden is high, we note that Royster needed to convince the trial court that at least one voter was somehow disenfranchised; the record before us fails to demonstrate that Royster made any effort to investigate this premise with any of the actual voters—though the identities of the persons who voted are available. The voting irregularities here occurred in only two precincts, not all precincts. The total vote in all precincts was 1,331. Since Royster wishes to prove that there were several voters who may not have even understood who they were voting for, it might have been worthwhile to have an investigator canvass those who voted in the two precincts.

4. The trial court made nearly identical "totality of the evidence" findings as it pertained to "Ward 11, Precincts 5 polling place at the Kansas City Museum," so we do not repeat those findings because to do so would be redundant.

5. The trial court expressly found that a Rizzo sign was brought into a polling station for approximately fifteen minutes, which was in violation of Section 115.637(18) that prohibits electioneering. The first such statute (Section 115.637(18)) need not detain this Court because Royster has failed to make any suggestion that each and every violation of this specific statute requires a new election. And for good reason, because if such were the law, then any individual running for office could merely take a picture of someone voting wearing the opposing candidate's campaign button on his shirt, in order to procure a new election.

that any violation of Section 115.445.3, regardless of how innocent or insignificant, requires the trial court to order a new election. To begin with, Royster argues that the "joinder of an election statute with a criminal law to punish violations of that election statute is a clear indication that the legislature considers the election statute mandatory," but he cites no authority to support his contention that just because a criminal punishment can be imposed upon someone for violating a specific election law, that this necessarily translates into the legal conclusion that the entire results of the election must discarded if such charges result. Moreover, Royster's argument ignores that the only wrongdoing found by the trial court in this regard was by the elections officials, and not by any voter. "[P]articularly where it is a mistake of an election official, the irregularity should not result in the disenfranchisement of the voters." *Elliott v. Hogan*, 315 S.W.2d 840, 846 (Mo.App.1958).

Royster also criticizes the trial court for seeming "to believe that a requirement of actual fraud should be superimposed on elections as a condition to granting a new election or recount," but this argument ignores that the Missouri Supreme Court has repeatedly held that whether fraud occurred is a relevant consideration prior to ordering a new election. "While the irregularities referred to should not be encouraged, they were not sufficient to constitute fraud, and in the absence of fraud we will not deprive the voters of their votes." *Kasten v. Guth*, 395 S.W.2d 433, 436 (Mo.1965). As was previously pointed out the general rule is that an election will not be annulled in the absence of fraud, even if some technical provisions of the law are not strictly followed. *Armantrout v. Bohon*, 349 Mo. 667, 162 S.W.2d 867, 871 (1942).

In a further attempt to demonstrate reversible error, Royster relies on statutes that are not at issue in the instant appeal. Specifically, Royster cites Section 115.291, which pertains to absentee ballots. We fail to see the relevance of this statute because no absentee ballots are at issue in the instant election, and as outlined above, our analysis is constrained only to those specific statutes called into question by the voting irregularity at issue. *See Kasten*, 395 S.W.2d at 435.

The two predominant cases relied on by Royster in this Point can be easily distinguished because in both cases this Court affirmed the finding of the trial court that the election in question was plagued by the failure to follow the applicable election laws. *Barks v. Turnbeau*, 573 S.W.2d 677, 682 (Mo.App.1978) ("The irregularities here were more than petty procedural infirmities but abuses of the election law which cannot be ignored."); *see also Elliott v. Hogan*, 315 S.W.2d 840, 842 (Mo. App.1958). This simply highlights the deference we owe to the trial court in making this ultimate finding. In highlighting these cases, and indeed in his entire argument, Royster fails to analyze or give meaning to the critical language in Section 115.549 that states "[i]f any court trying a contested primary election determines there were *irregularities of sufficient magnitude* to cast doubt on the validity of the initial election, it may order a new primary election for the contested office." *Id.* (emphasis added). Here, Royster has simply failed to demonstrate that the trial court erred in concluding that the irregularities in question were not of a sufficient magnitude to warrant ordering a new election. *See Black v. Bockenkamp*, 607 S.W.2d 176, 178 (Mo.App. E.D.1980).

For all of the aforementioned reasons, Point One is denied.

**B. The Failure To Initial Ballots**

In Point Two, Royster alleges that the "trial court erred in its decision when it found that multiple violations of statutorily required procedures for qualifying voters to receive ballots and to vote in the election were not sufficient to justify a new election."

A quick outline of voting procedures will frame the context for analyzing the issues raised by Royster in this Point. A voter entering a polling place first signs the precinct register, and two election judges of opposing political parties identify the voter and initial the register. *See* Section 115.427.1 and Section 115.431 (2009 Cum. Supp.). All voters' names on the precinct register are numbered consecutively in the order in which they have signed. Section 115.431. After the voter's identity has been certified, two judges of different political parties, or one judge from a major political party and one judge with no political affiliation, shall initial the voter's ballot or ballot card. *See* Section 115.433. Once these requirements have been satisfied, the election judges shall allow the voter to proceed to the voting booth and vote. *See* Section 115.435.

In this argument, Royster only points to *one* specific statute that provides an *express* sanction for failing to follow one of the above statutory mandates. Section 115.457 states the following:

If a ballot appears without the initials of two election judges, the ballot shall be rejected, *except when it appears the absence of initials is due to a mistake of the election judges* and that the ballot is otherwise legal and proper.

(Emphasis added.)

The only specific finding of wrongdoing found by the trial court in this regard was that fourteen ballots in total "were identified that were not initialed by two election judges." After hearing evidence presented by the opposing parties in this matter, the trial court found the following as it pertained to the Garfield Elementary School Polling Place:

Based on the totality of the evidence, including the Court's determination of the credibility and bias of the witnesses, the evidence demonstrated that, although ... the election judges may have made mistakes in administering certain election requirements, such as ... not properly documenting all aspects of the check-in process, and not having both a Democratic and a Republican election judge initial each the ballots, the evidence does not establish that the conduct was fraudulent, that any person who was not registered to vote voted, or that any registered voter was prevented from casting their ballots as intended.

As it pertained to these disputed ballots, the trial court reached the critical legal conclusion that "[t]he credible evidence demonstrates that the ballots without the initials of two (2) election judges are in that condition due to mistakes made by the election judges and that the ballot is otherwise legal and proper." Because the trial court expressly found that the failure to initial the ballots in question was due to the mistakes made by the election judge, we conclude that the trial court did not err in refusing to reject these ballots pursuant to Section 115.457.

Royster acknowledges the express finding by the trial court that the failure to initial these ballots was due the mistake of the election judges. However, Royster makes an unrelated argument that because these un-initialed ballots were not "otherwise legal and proper" pursuant to Section 115.457, the trial court was compelled to discard these votes cast. However, to support his argument that the votes were not "otherwise legal and proper," Royster relies on facts *that were not found by the trial court.* To give just one example,

Royster argues that "the ballots at this Precinct were left unattended at the far end of the table from the one (1) election judge who was monitoring the precinct during the time of her voting according to one eye-witness, Billie Robleado." But this argument, and all the other arguments that Royster makes like it, ignore the fact that "[t]he trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *Sch. Dist. of Kansas City*, 317 S.W.3d at 604 (quotation omitted). It goes without saying that the trial court could not have erred for failing to grant a new election based on specific conduct if the court did not find that the specific conduct *actually occurred.*

Finally, Royster argues that the findings and conclusions of the trial court were not supported by substantial evidence:

> *Mr. Kieffer, one of the Directors of the Election Board, testified that he, along with the Co–Director of the Election Board, reconciled the number of cast ballots with the number of registered voters signing the polling place roster and the tally sheet prepared by the election judges.* There were 187 ballots issued and 186 ballots cast. There was no difference between the number of ballots cast by registered voters and the votes tallied. *Based on this reconciliation, Mr. Kieffer testified that he concluded that the failure of the optical scan ballots to be initialed by both judges was due to a mistake of the election judges in not initialing the ballots, not any conduct by a voter.* The Court finds this testimony credible.

Royster argues that "the Trial Court is mistaken" because "Mr. Kieffer never testified that the number of cast ballots reconciled with the number of voters signing the roster." Royster also argues that Mr. Kieffer was unqualified to opine as to what caused the ballots in question not to be

initialed because Mr. Kieffer did not speak to these election officials regarding this matter. Based on the following trial testimony of Mr. Kieffer, we disagree:

Q. So let me get this straight, you go, you check where the people go in to register and they show their ID, and you see how many names—or you see the names, *you see how many people signed in to vote;* correct?

A. Okay. They don't register, they come to vote.

Q. Yes. But they're checked off; correct?

A. Yes. It's initialed by the judges and they put a sticker, you're right.

Q. And you count all those folks up and they come to a number; correct?

A. Right. It's a tally, it goes on the tally sheet from the judges.

Q. Right. I'm just trying to over simplify this for my brain. Then you go, you count all the votes, and make sure they match, correct, that the—

A. In total.

Q. In total to what you have on the tally sheet of people that went in to vote?

A. Right. It's a third party representation of that polling place.

Q. And then you have the absentee voters and in this case there was only one voter, absentee?

A. In this situation.

Q. In this situation? And those numbers all match up; correct?

A. Right.

Q. So that would indicate to you that nobody stuffed the ballot box without it getting by the judges then, correct?

A. That would be my assumption.

Q. Okay. And let me ask you something, should a qualified voter, an American citizen, if you will, should they be

disenfranchised, that is, should their vote not count because a judge forgot to initial the ballot?

A. No.

. . . .

Q. [The Court]: I believe I remember you testifying that the same number of people voted that ballots were given out to some; is that correct?

A. During our subsequent analysis we believe that there were 187 ballots actually given out, 186 had actually voted and one person did not vote for whatever reason.

Q. [The Court]: Okay. There weren't more votes cast than there were ballots issued then, there were less votes cast—

A. True.

Accordingly, we believe that the aforementioned testimony by Mr. Kieffer, and the reasonable inferences to be drawn from it, support the trial court's above factual findings.

For all of the aforementioned reasons, we deny Royster's second Point Relied On.

**C. Consolidation of precincts in the 40th Legislative District**

▆ In Point Three, Royster argues the "trial court erred in its decision when it determined that precincts in the 40th Legislative District were lawfully consolidated, because Section 115.115 RSMo. prohibits in all cases, the consolidation of polling places for precincts that do not join geographically." It was not disputed at trial that precincts were consolidated at polling locations at Sycamore Groves Apartments and Saint Mark Union Church.

Section 115.115.2 provides the following:

For any election, the election authority shall have the right to consolidate two or more adjoining precincts for voting at a single polling place and to designate one set of judges to conduct the election for such precincts. Voters shall be notified of the place for voting in the manner provided in section 115.127 or 115.129.

▆ First, we consider whether Royster has a legally cognizable interest in the subject matter. Royster does not challenge the election results in this Point, but only the alleged mis-consolidation of precincts. There is a question as to whether Royster, as a candidate, has a legally cognizable interest in the location of the polling places. *See* Section 115.115.2. " 'Standing requires that a party seeking relief have a legally cognizable interest in the subject matter and that he has a threatened or actual injury.' " *Mink v. Wallace*, 84 S.W.3d 127, 129 (Mo.App. E.D. 2002). Section 115.553 provides that "[a]ny candidate for election to any office may challenge the correctness of the returns for the office, charging that irregularities occurred in the election." Because in this Point Royster does not challenge, at least directly, the correctness of the vote return, his standing to challenge the consolidation of the precincts is therefore open to question.

Even when assuming *arguendo* that he had standing to bring the instant claim, Royster has failed once again to demonstrate that the trial court's relevant findings and conclusions in this regard were somehow in error: "No evidence suggests that the combining or consolidating of the precincts had any impact on the election." No evidence was presented to the trial court of a single voter that was not able to vote (or even inconvenienced) because their polling place was located in an improperly consolidated precinct. Royster in his brief does not cite to any specific evidence of harm but merely asserts that "[i]n one of these consolidated precincts, no voter voted, in any race." However, there was no evidence as to *why* no voter

voted in that district or how many voters were registered in that precinct. The trial court's determination that Royster failed to demonstrate that the precinct consolidation had any effect on the election is supported by the record and is dispositive of this claim on appeal. As discussed previously, Royster points to no evidence that was before the court to suggest that an improper consolidation resulted in any irregularities or prevented even one voter who wished to vote from voting. Rather, on appeal Royster merely makes the bald assertion that the consolidation had "a chilling effect on the vote." Therefore, the trial court did not err in denying his claim because he failed to demonstrate that he was entitled to the requested relief.

Point Three is denied.

### D. Combination of Alleged Election Law Violations

In Point Four, Royster argues that the "trial court erred in denying a new election because … the combination of the many violations of election laws showed such a total disregard for the law, and a willful violation of the general spirit and controlling purpose thereof, that the election should have been invalidated."

This Point merely conglomerates the arguments previously made by Royster on appeal and argues that their totality warrants a new election. But as discussed at length already in this opinion, the trial court found that the claimed irregularities did not warrant a new election as a matter of law. We will not repeat herein why we believe the trial court's specific findings of fact and conclusions of law were not erroneous because to do so would be redundant.

Point Four is denied.

### Conclusion

While minor irregularities and miscues by election officials may not be uncommon, *any* irregularities are scrutinized and are not taken lightly by this court. But suspicion that someone *could* have had an improper motive in assisting voters is not proof that such person *did* have an improper motive, or that such person carried out any wrongful plan, particularly when the trial court found, based on the record before it, that all voters were registered voters, and all voluntarily accepted (and presumably asked for) the assistance they had. The trial court had reason to reach the conclusions that it did and the evidence supported those conclusions.

It goes without saying, however, that our democracy is premised on the fact that free and fair elections occur in this State. Those election authorities in whom we place this deep trust must place the highest regard in fulfilling their duties because our system of government cannot function without their dedicated service to enforce the law in this regard. Because any irregularities will be closely scrutinized by the courts, we urge the Board to fully review and strengthen its procedures and training of election judges.

With that said, for all of the aforementioned reasons, we affirm the judgment of the circuit court based on the fact that Royster has simply failed to demonstrate that the court's judgment was somehow in error.

All concur.